## HARRY S. MECARTNEY v. GUARDIAN TRUST COMPANY, Appellant.

### Division Two, April 26, 1918.

1. **CONTRACT: Attorney's Employment: Construction: Relation to Subject-Matter.** A contract of employment of an attorney, in which he designates the probable fee to be paid him for his services in bringing to a conclusion complicated litigation having many entanglements, is to be interpreted in the light of surrounding circumstances. If of doubtful meaning, it will be given a construction which will make it reasonable and fair between the parties. It is fundamental of all rules that the intention of the parties must be gathered from the subject-matter of the contract, the relation of the parties to the subject-matter, and the ordinary language used.

2. ————: ————: ————: **Quantum Meruit: Estimate of Time and Fee.** Where plaintiff, after an investigation, was asked to make an

Mecartney v. Trust Co.

"estimate of what the ultimate law fees would be," and replied. with an estimate of the time within which the litigation might be concluded and of what his maximum fees would be during that time, the two estimates, made in the same connection, cannot be so separated as to limit his recovery to the estimated amount and to lengthen out the time to a much longer period; and if the time in concluding the litigation far exceeded his estimate, without his fault, but because new contingencies developed which prolonged and intensified his labors, and during the progress of his employment other litigation, not in contemplation at the time his estimate was made, was added to the litigation first placed in his hands, his recovery is not limited to the estimated fee, but he is entitled to recover the reasonable value of his services.

3. ———: ———: Without Fixing Compensation: Quantum Meruit. A contract of employment binding upon the parties may be made which does not designate the compensation to be paid. In such case the compensation is *quantum meruit*. And where it was understood that plaintiff was to receive a reasonable compensation, and the contract contained only an estimate of the probable fees to be paid, he is in no worse plight than he would be had the contract made no mention of compensation.

4. ———: Or Quantum Meruit: Variance. Where the petition states in detail and at length the services rendered by plaintiff, proceeds on the theory that he was employed without a definite amount being fixed as compensation therefor, and asks judgment for the value of those services, it states an action for *quantum meruit;* and even though defendant contends that the compensation was not to exceed a designated sum, and plaintiff that there was no such limit, it is still a suit in *quantum meruit*, if defendant's trial theory was that plaintiff was entitled to recover the value of the services rendered within a maximum limit.

5. QUANTUM MERUIT: Compulsory Reference: Special Findings by Court. A lengthy memorandum of specific findings of fact made by the trial judge, in addition to his general finding, is not a finding under the statute, and adds nothing to the general finding, but may be of value on appeal as showing inducements for inferences drawn by the judge different from those drawn by the referee.

6. ———: ———: In Law Case: Review. If the case is an action at law and one of compulsory reference, and exceptions to the referee's report are sustained and the report set aside, a subsequent finding by the court, after additional evidence is taken, is, as to the facts found, if supported by evidence, binding on the appellate court.

7. ———: Reasonable Compensation: $107,360.57 for Attorney. The evidence is fully reviewed, and it is held that an allowance of a compensation of $107,460.57, less $27,500 previously paid, for

274 Sup.—15.

services rendered by an attorney during three and one half years, and by six assistants employed by him, together with his immense traveling and other necessary expenses, in defending numerous suits for defendant, involving from $22,000 to $1,500,000, in which, despite many legal entanglements and the thwarting opposition of defendant's board of managers, he defeated one suit for $1,500,000, won $800,000 for his client in another, and succeeded in successfully handling the others, was convincingly reasonable.

8. ———: ———: **Successful Litigation.** The results of an attorney's efforts may fairly be considered as an element in measuring the value of his services.

9. ———; ———: **Evidence: Records in Other Cases: Competency: Opposition of Client.** Where after the attorney had prepared and tried defendant's case in the Federal court, he was discharged before decision was rendered, and his successor, because of the machinations of defendant's manager who was working in the interest of the adversary litigant, preserved no assignments of errors, whereupon individual stockholders employed the attorney to intervene in their behalf in the appellate court and as a result of his efforts the judgment was reversed, the records in that case are competent evidence in his suit to recover compensation for his services rendered prior to his discharge, in which one of the defenses is that he was incompetent, for the purpose of demonstrating the soundness of his theories in the conduct of the litigation which had been entrusted to him by defendant, and for the purpose of showing the opposition and enmity of the directors of the defendant company and their efforts to prevent a favorable result.

10. ———: **Interest: Amended Petition.** An attorney, who sues in *quantum meruit* for the reasonable value of services rendered, is entitled to interest on the allowance from the time suit is brought. And if an examination of his amended petition shows that he asked for no greater sum in it than he had in his original petition, he is not to be denied interest between the dates of the filing of the two petitions.

11. ———; ———: **Asking For Reference.** An attorney is not to be deniedinterest on the reasonable value of his services rendered because he asked for and obtained a reference, and thereby caused delay in the final determination of the case. No litigant is to be punished for resoring to authorized means for the administration of justice.

12. ———: **Employment: Arbitration: Premature Suit.** A defendant, when sued in *quantum meruit* by its attorney for the value of services rendered, in order to maintain its contention that the contract of employment provided for an adjustment by arbitration and there had been no attempt to arbitrate, must plead such defense.

13. ——: ——: ——: **Right to Sue.** An agreement to arbitrate does not oust the court of jurisdiction, nor create a condition precedent, unless by express words or necessary implication the contract imports an intention to make it a condition precedent.

14. ——: ——: ——: **Indefinite Proposal.** A mere suggesion or proposal to submit to appraisers the question of attorney's fees, contained in a letter in which he estimates the value of his services, is unenforcible, as an agreement, for want of definiteness.

Appeal from Jackson Circuit Court.—*Hon. Frank G. Johnson,* Judge.

AFFIRMED.

*Delbert J. Haff, Charles W. German* and *Justin D. Bowersock* for appellant; *Haff, Meservey, German & Michaels* and *Gates & English* of counsel.

(1) The judgment is excessive. Randall v. Kingsland, 53 How. Prac. 512; Litensdorfer v. King, 7 Colo. 436; Ex parte Plitt, 2 Wall, Jr. 453; Wright v. Livery Co., 59 S. W. (Tenn.) 677; Kingsbury v. Joseph, 94 Mo. App. 298. (2) Interest is not recoverable on unliquidated demand. Trimble v. Railroad, 180 Mo. 574; Macomber v. Bigelow, 123 Cal. 532; Sec 5430, R. S. 1909; Dozier v. Jerman, 30 Mo. 216; McCormack v. Lynch, 69 Mo. App. 524. (3) Interest should not have been allowed from March 28, 1908. Secs. 5430, 7179, R. S. 1909; Lack v. Brecht, 166 Mo. 242; Carson v. Smith, 133 Mo. 606; Wheeler v. McDonald, 77 Mo. App. 213. (4) The amount of plaintiff's compensation was fixed by his letter of December 6, 1904, to the executive committee. Kennedy v. McKone, 10 App. Div. 88, 41 N. Y. S. 782; Kramer v. Ewing, 10 Okla. 357; Western v. Sharp, 14 B. Mon. (Ky.) 144. (5) Plaintiff was bound to arbitrate the amount of his compensation. Bales v. Gilbert, 84 Mo. App. 675; Tennant v. Fawcett, 94 Tex. 111; Roche v. Baldwin, 135 Cal. 522; McNees v. Insurance Co., 61 Mo. App. 335; Murphy v. Mercantile Co., 61 Mo. App. 323; Stevens v. Ins. Co., 120 Mo. App. 88; James v. Ins. Co., 135 Mo. App. 247; Gragg v. Ins. Co., 132 Mo.

App. 405; Roy v. Boteler, 40 Mo. App. 213; Nofsinger v. Ring, 71 Mo. 149; Williams v. Railroad, 112 Mo. 486; Pres., etc., v. Coal Co., 50 N. Y. 250; Lawrence v. White, 131 Ga. 840; Davisson v. Land Co., 96 Pac. 88, 153 Cal. 81; Pacaud v. Waite, 218 Ill. 138; Contracting Co. v. Power Co., 170 N. Y. 439; Mosnes v. Ins. Co., 50 Minn. 341; Lumber Co. v. Ins. Co., 80 Mich. 116; Ins. Co. v. Stocks, 149 Ill. 319; Carroll v. Ins. Co., 72 Cal. 297; Saucelito Co. v. Assurance Co., 66 Cal. 253; United States v. Robeson, 9 Pet. 319; Sutherland on Damages (3 Ed.), sec. 678; Hoyle v. Stellwagen, 28 Ind. App. 681. (6) The circuit court erred in admitting evidence of events transpiring after plaintiff's employment ceased. (7) Evidence was erroneously received of expert witnesses resident in Chicago of the value of plaintiff's services. Ward v. Kohn, 58 Fed. 462; Gaither v. Dougherty, 18 Ky. 709; Stanton v. Embrey, 93 U. S. 548; Knight v. Russ, 77 Cal. 410; Clark v. Ellsworth, 104 Iowa, 442; State ex rel. v. Seavey, 137 Mo. App. 1; Nelson v. Masterton, 2 Ind. App. 524. (8) The trial petition pleads a contract of employment. The judgment is on *quantum meruit*. Secs. 1794, 1813, R. S. 1909; Railroad v. Kimmel, 58 Mo. 85; Huston v. Tyler, 140 Mo. 252; Hayes v. Bunch, 91 Mo. App. 467; Warder v. Seitz, 157 Mo. 140; McDaniel v. Emmick, 149 Mo. App. 274; Bassford v. West, 124 Mo. App. 256; McCormick v. Fidelity & Guaranty Co., 114 Mo. App. 460; McDonnell v. Stevinson, 104 Mo. App. 191; Eyerman v. Cemetery Assn., 61 Mo. 489; Wade v. Nelson, 119 Mo. App. 278; Davis v. Drew, 132 Mo. App. 503; Squire v. Brewing Co., 90 Mo. App. 462; Koons v. Car Co., 203 Mo. 227.

*James A. Reed, J. G. L. Harvey* and *J. C. Rosenberger* for respondent.

The sufficiency of the evidence to sustain the finding of the trial court is not open to review in this court. This for several reasons: 1st, because this court will not review a finding of fact made by the trial court where there is any substantial evidence to support it; 2nd, because

Mecartney v. Trust Co.

part of the evidence has been omitted by appellant from its abstract; 3rd, because appellant introduced additional evidence before the trial court after the referee had filed his report and thereby it abandoned the referee's report and submitted the cause, on such additional evidence, to the trial court, sitting as a jury, whose finding upon a question of fact is not open to review on appeal. (a). Appellant has not brought to this court all the evidence upon which the trial court acted: It is settled law that the burden is on the appellant to show that the judgment is not supported by the evidence and that the Supreme Court will not convict the trial court of error in that regard when all of the evidence is not before it. Sonnenfeld v. Rosenthal, 247 Mo. 238; Maplegreen v. Trust Company, 237 Mo. 350; Vandeventer v. Goss, 190 Mo. 241; Tobacco Co. v. Walker, 123 Mo. 662; Gooden v. Mod. Woodmen, 194 Mo. App. 666; Crohn v. Mod. Woodmen, 145 Mo. App. 158; Furstenfeld v. Furstenfeld, 152 Mo. App. 726. (b) The appellant abandoned the referee's report and submitted the cause to the trial court sitting as a jury: by failing to ask for a recommital to the referee after the trial court had ruled that the referee erred in excluding certain testimony which was considered by the trial court; and by introducing additional evidence before the trial court not heard by the referee. The rule that this court will not review the finding of the trial court upon a question of fact where there is any evidence whatsoever to sustain such finding, applies with special force to this case. State ex rel. v. Ice Co., 246 Mo. 168. This having been a case in which a compulsory reference could have been ordered, the report of the referee was advisory only, and the trial court had the right "to act upon the report of the referee and find therefrom different conclusions of fact from those reported by the referee;" and the finding of the trial court will not be disturbed where there is any substantial evidence to support it. State ex rel. v. Ice Co., 246 Mo. 168; Utley v. Hill, 155 Mo. 258; Tobacco Co. v. Walker, 123 Mo. 662; Smith v. Baer, 166 Mo. 403.   (2)

The court did not err in admitting evidence of what trans-
pired in the appeal after plaintiff's discharge. Plain-
tiff could not recover in this suit for any services rend-
ered to the appellant after his discharge, however great
the value of those services was. But he did not ask, nor
did the court allow him, anything on this account, as
its memorandum opinion clearly shows. This evidence
was competent for two purposes: (1) to rebut the charge
made by appellant that his services were negligent, un-
skilful, and worthless; and (2) to show the result
achieved for appellant by the services for which he sues.
(3) The judgment is not excessive. In fact plaintiff
should have sued for a larger sum. This was peculiarly
a question of fact for the trial court whose finding is
not open to review here if there was any substantial evi-
dence to sustain it. That there was such substantial evi-
dence, even the appellant will hardly dispute. Ward v.
Kohn, 58 Fed. 462; Trust Co. v. Railway, 146 Fed. 337;
Trust Co. v. Railway, 171 Fed. 43; Trust Co. v. Steel
Co., 201 Fed. 811; Trust Co. v. Steel Co., 210 Fed. 696;
Railway v. Trust Co., 240 U. S. 166. A reading of the
various opinions of the appellate courts above enumerated
will in itself sufficiently demonstrate the magnitude and
complexity of the litigation, its importance, the amounts
involved, the labor and responsibility devolving upon the
plaintiff, and the skill and courage with which he dis-
charged his duties. The results accomplished were: first,
a decree of nearly one million dollars obtained for this
appellant, included in which is the reservation to appel-
lant of the right to recover all of its damages and ex-
penses incident to the litigation, including plaintiff's fees
now sued for; second, and in addition to all this, the com-
plete defeat by appellant of claims of millions of dollars
asserted against it by the Cambria Company, the Belt
Company and its receivers, and by the Southern Com-
pany; and, third, attainment of this result by plaintiff
over the opposition of his own client: (4) No interest is
included in the judgment except that accruing after the
institution of this suit. (5) The trial court did not err in

allowing plaintiff interest from March 28, 1908, the date of the instituton of the suit. Sec. 7179, R. S. 1909; Trimble v. Railway, 180 Mo. 574. (6) Plaintiff's compensation was not fixed by his two letters of December 6, 1904, the date of his employment. Many other controversies and disputes wholly outside the scope of his original employment, and which did not arise until afterward, were put into plaintiff's charge long after these letters were written. It is idle, therefore, to say that plaintiff's guess, or estimate, contained in the above letters delimited his charge. If said letters had not been a mere "guess," or "estimate" as stated therein, but had been a definite contract, still plaintiff would have been entitled to recover the value of services rendered in other and distinct disputes not within the scope of such contract. Singer, Minick & Co. v. Steele, 125 Ill. 426; Barcus v. Gates, 130 Fed. 364. (7) It was not error to receive the evidence of Chicago lawyers touching the value of plaintiff's services. Stanberry v. Dickinson, 35 Iowa, 493; Quint v. Ophir Mining Co., 4 Nev. 766.

WHITE, C.—The plaintiff recovered judgment in the circuit court of Jackson County, for services rendered defendant, as attorney, and the defendant appealed.

The petition is in two counts; a third count was dismissed before trial. The recovery was on the first count for a balance of $79,860.57, and on the second count for a balance of $3,433.07, with interest from the date of filing the suit, March 28, 1908.

Plaintiff was employed by defendant December 6, 1904, and was discharged March 27, 1908. The services rendered for which compensation is demanded in the first count began with what was designated as the "Suburban Belt" and "Channel & Dock" cases. A short account of the way those cases arose is necessary in order to understand their condition and the work which plaintiff undertook when he was employed.

The defendant, Guardian Trust Company, called the "Trust Company," was incorporated in 1889, located

at Kansas City, and for several years did a large business in financing railroad enterprises. The following corporations became involved in the litigation with which we are concerned:

The Kansas City, Pittsburg & Gulf Railroad Company, designated as the ''Gulf Company,'' which had a line of railroad extending from Kansas City to Port Arthur, Texas, but without terminal facilities at either end;

Port Arthur Channel & Dock Company, called the ''Dock Company,'' which owned a terminal system at Port Arthur;

Kansas City Suburban Belt Railway Company, called the ''Belt Company,'' was a belt railroad line having terminal facilities at Kansas City;

The Gulf Company had traffic arrangements with the Belt Company for entrance into Kansas City, and with the Dock Company for entrance into Port Arthur.

The Kansas City Southern Railway Company, called the ''Southern Company,'' grew out of the other three, being in fact the product of a reorganization of the other three in March, 1900. The details of the proceedings by which that was accomplished it is unnecessary to relate at this point, though the matter will be noticed later in this opinion.

At the time of that reorganization the Belt Company owed the defendant here, Guardian Trust Company, about $400,000, to secure which it had assigned to the Trust Company certain stocks and bonds as collateral. Under the terms of the reorganization, as it transpired, the Southern Company became liable for this debt, which obligation was fruitful of the litigation in which the defendant herein was almost hopelessly entangled at the time of plaintiff's employment.

In September, 1900, the Cambria Steel Company, a Pennsylvania corporation called the ''Cambria Company,'' obtained a judgment against the Belt Company,

and immediately filed a creditor's bill in the Federal court, making the Belt Company and the Trust Company parties defendant. This bill sought to enjoin the Trust Company from enforcing its claim against the collateral above mentioned, prayed for an accounting, and alleged that on a true accounting the Trust Company would be found indebted to the Belt Company. The bill also asked for a receiver for the Belt Company.

At the same time the Provident Light & Trust Company, called the "Provident Company," filed a bill, as trustee of bondholders, to foreclose a mortgage on the property of the Belt Company.

A restraining order was issued against the Trust Company, and the Belt Company was placed in the hands of receivers. Some time later these receivers filed an ancillary bill, in which they alleged that the Trust Company, through a long course of dealing, had cheated and defrauded the Belt Company, and that the notes of the Belt Company held by the Trust Company represented fictitious obligations, and prayed to have them canceled and for an accounting by the Trust Company of its transaction with the Belt Company. The issues thus framed required the examination of accounts involving transactions amounting to over $8,000,000.

That suit, with the multiple attacks upon the defendant Trust Company by the several parties mentioned, had been pending about four years, when plaintiff in November, 1904, was employed to examine the condition of the litigation. Defendant's claim of $400,000 was tied up by the restraining orders, about 8,000 pages of testimony had been taken before a special master with no prospect of an early determination of the case. Trimble & Braley, defendant's attorneys, discouraged by the long delay and their apparent inability to bring the case to a conclusion, as they said on account of prejudice against defendant in the Federal court, had resigned, and defendant was left without counsel.

This case is mentioned in the evidence as the "Suburban Belt case."

At the same time a bill was pending in the Federal court in Texas in a case where it was sought to recover from the Trust Company about $1,500,000 for alleged subscription for stock in the Dock Company, and defendant, on the other hand, was asserting a claim of $22,000 against the Dock Company. This is called the "Channel & Dock case."

Matters were in this posture when plaintiff was employed to examine their condition. Affairs had reached a sort of deadlock on account of existing conditions in Kansas City, and it was thought some outside counsel would be better able to make the litigation move. Plaintiff who lived in Chicago, was employed, and presented an elaborate report, for which examination and report he received $1,500. Thereupon he was employed to represent defendant in the cases mentioned. The terms of that employment and the additional work and responsibility thrust upon him by subsequent events and defendant's management, will be referred to in considering points which arise in the case. Compensation for all that service is sued for in the first count of plaintiff's petition.

Defendant's former attorneys, Trimble & Braley, sued for a fee of $22,000 and plaintiff was required to defend that suit. He filed counterclaims therein for large amounts, and the second count of his petition is for services rendered in that case.

The case was referred, and after an exhaustive hearing the referee found for plaintiff on the first count as follows:

For services rendered by plaintiff and his
    assistants ......................$ 35,000.
Credited by payments .................  20,139.43

    Leaving balance of ...............$ 14,860.57

On the second count the referee found that plaintiff had been paid $2,500 and that amount compensated him for services rendered and expenses.

The trial judge set aside the report and findings of the referee on plaintiff's motion, and after taking further evidence rendered judgment for plaintiff as follows:

### First Count.

| | |
|---|---:|
| For services rendered | $ 100,000.00 |
| Paid out for expenses | 7,360.57 |
| | $ 107,360.57 |
| Credits | $ 27,500.00 |
| Balance Due | $ 79,860.57 |

### Second Count.

| | |
|---|---:|
| Fee | $ 5,500.00 |
| Less credits | 2,066.93 |
| Balance due | $3,433.07 |

and allowed interest from the date of filing suit.

I. Appellant asserts that plaintiff is limited by his contract of employment to a compensation of $25,000 for all services rendered and sued for in the first count of his petition. Two letters of his and a resolution of defendant's executive committee are relied upon as establishing the contract which so limits his recovery. These letters, dated December 6, 1904, are as follows:

*Construction of Contract.*

"December 6, 1904.

"Mr. E. A. Shedd,

Vice President Guardian Trust Co.,

"Dear Sir:

"You asked me to state on what terms I would be willing to take the cases of the Guardian Trust Co. against the Suburban Belt Co., the Channel & Dock Co., and the Kansas City Southern Co. These are the same terms that I would be prompted to make with any counsel com-

petent to handle the case, were I acting for the company, The case is a burden which should be taken up cheerfully by counsel and given special preference. Such counsel should have an immediate financial inducement to do this; and to be fixed to spend money promptly, though economically, in order to press it hard to a speedy conclusion; paying retainers to local counsel and others whom he might employ to assist him, in order to make 'rush' jobs out of the work farmed out to them. As to myself, if such substantial retainer were paid me, in addition to the amount which may be fixed for the report just finished, I would hope to make it last until a decree were reached in the Kansas City case. If grossly disappointed as to my expectations as to when this point would be reached, I would not call for any more money unless I could make it clear that I had paid out the greater part of this as expenses, etc., and that the matter was too heavy for me to justly carry without some other additional payment on account. I think that $5,000 would be an appropriate and moderate retainer. My experience is that I get far more prompt returns from lawyers whom I engage when I pay them retainers and I have a well founded suspicion that I yield to that rule myself. As to an ultimate charge, or fee, I would suggest that it be fixed by mutually chosen appraisers, and from this amount I would be willing to deduct say five per cent. I suggest this simply as an evidence that I endeavor to be under, rather than over, 'the market.'

"Truly,

"H. S. MECARTNEY."

"Kansas City, Missouri, December 6, 1904.

"Guardian Trust Company,

Kansas City, Missouri.

"Gentlemen:

"In response to a request for my estimate as to what the ultimate law fees would be in the Suburban Belt and Channel & Dock cases I would say that if the cases should be settled before final decree, my guess is that such fees would run from $10,000 to $15,000. If

fought through to final decree and through the Court of Appeals, they might run up to $25,000. As to an estimate of the time required to realize upon the claim in the latter case, two years to two and one-half years would seem to me to be the limit.

"Respectfully,

"H. S. MECARTNEY."

The resolution is as follows:

"Mr. English (Reading): On motion duly made, it was voted that the proposition as presented by Mr. Mecartney as to employment as counsel, to carry on and take charge of the litigation of this company against the Kansas City Suburban Belt R. R. Co., and the Port Arthur Channel & Dock Co., be accepted, and that he be, and is hereby employed as such counsel; and that the sum of $5,000 be advanced him to apply as retainer on account of expenses in such litigation."

Contracts of this character are to be interpreted in the light of surrounding circumstances. Among other things the executive committee had before it the report which the plaintiff had just made on the state of the cases. In that report he had dwelt upon the discouraging condition of the litigation, the long delays in reaching a conclusion, and had expressed his opinion that with a proper and vigorous prosecution the cases could be brought to an early termination. He spoke of the temptation that existed in the Belt case "to use the courts for the purpose of beating off a liability, and by delay consuming a great deal of the substance of the case," but expressed his confidence in the outcome of that case, and said:

"But I do not see why the Federal court, or any other court, should be powerless to grant us a speedy determination of this inquiry and give us an early decree for what may be found due."

This confidence is based on a conclusion of his "that the bill of complaint in the case, and the cross-bills of the Belt receivers asking for an accounting between these companies, should have been demurred to and dismissed

upon their face.'' He expressed in that report his opinion as to the duration of the case:

''If the matter be taken hold of vigorously and the master and court can be enlisted in the effort to speed the cause in the way that fairness to the case demands, a final decree in the case should be reached in four or five months and certainly in eight months at the outside.''

In addition to that report plaintiff was before the executive committee at the time and stated to them: ''I might as well tell you gentlemen that so far as my own personal time is concerned no business has been any object to me that would bring me less than $100 a day,'' though he said he charged less for the time of his assistants and associates. He added that one hundred dollars a day didn't mean thirty thousand dollars a year by any means, because of the time necessarily lost in various ways during the year in a lawyer's business, including services rendered to poor clients who were unable to make such payments. It was understood further that plaintiff's home and office were in Chicago, where he and his assistants would do the greater part of his briefing and office work, and he necessarily would make numerous trips from there to Kansas City in the conduct of the business.

It is a rule which courts recognize that a contract of doubtful meaning will be given a construction which will make it reasonable and fair between the parties and will not give one party an unfair advantage of another. [Laclede Power Co. v. Stillwell, 97 Mo. App. 258; Coal & Iron Co. v. Coal Co., 176 Mo. App. l. c. 421; Lumber Co. v. Dent, 151 Mo. App. l. c. 618; Zinc & Lead Co. v. Ins. Co., 152 Mo. App. l. c. 342.]

The fundamental of all rules is that the intention of the parties must be gathered from ''the subject-matter of the contract, the relations of the parties to that subject-matter, and the ordinary meaning of the language used in the contract. [Donovan v. Boeck, 217 Mo. l. c. 87.]

We are not without precedents construing contracts of employment of attorneys, very similar to the arrange-

ment here. [Bond v. Sandford, 134 Mo. App. 477; Dickerson v. Scheuer, 1 N. Y. Supp. 419; Tong v. Orr, 44 Ind. App. 681; Barcus v. Gates, 130 Fed. 364; Singer, Nimick & Co. v. Steele, 125 Ill. 426.]

In the case of Bond v. Sandford, Judge MARSHALL of the firm of Bond, Marshall & Bond, was requested to state what fees he would ask if employed in a certain case. In a letter replying he asked for a retainer of five hundred dollars, and suggested that additional charges would be subject to future agreement. The state of the record then was explained to him by letter in which it was requested that he make definite statement of his fee, and he replied: "Unless there is something more in the case than we now know of, there will be no further charge than the five hundred dollars, but in any event there will be no misunderstanding between us."

After the termination of the case his firm sued for fifteen hundred dollars, in addition to the five hundred dollars already paid. It was shown that the case involved the investigation, briefing and arguing of questions which did not appear by the correspondence between the parties. It was held that the contract did not limit the recovery to the five hundred dollars stipulated; and plaintiffs were allowed to recover for the reasonable value of their services.

In the case of Dickerson v. Scheuer, 1 N. Y. Supp. 419, plaintiff was asked to tell his client what the fees and expenses of the case might be. The reply was: "It may cost three thousand dollars, it may come up to five thousand with all expenses included." He was told to go ahead with the case. It was held that the agreement did not limit the total expense of the litigation to five thousand dollars.

In the case of Tong v. Orr, 44 Ind. App. 681, the plaintiff was employed as attorney to prosecute a suit for a certain stipulated compensation, the understanding being that the defense would be merely formal. It turned out that the case was vigorously contested,

and it was held that the plaintiff was not limited to his first contract in the recovery for compensation.

In the case of Barcus v. Gates, 130 Fed. 364, the plaintiff was employed as an attorney with an agreement that he was to receive a certain percentage of what should be recovered. It appeared at the time that the parties expected a settlement would be made. A settlement was not made, the claim was contested and a number of years in court required to realize on the claim. It was [held] that the additional services thus required were not in the contemplation, and the plaintiff could recover the value of his services beyond the percentage mentioned in the contract.

In the case of Singer, Nimick & Co. v. Steele, 125 Ill. 426, a lawyer was employed on an agreement that he should receive five hundred dollars for making a certain settlement. He settled with the debtor with the approval of his client, receiving a part of the amount due in notes of third persons. These notes required afterwards to be collected and it was held the attorney was entitled to additional compensation for such services.

In this case it will be noted the plaintiff had been requested to make an "*estimate* as to what the ultimate law fees would be." He proceeded to make that estimate on the various contingencies of a settlement before decree, or on a fight to a final decree, using the word "guess" and also the expression, "they might run up to twenty-five thousand dollars," which latter expression is a guess or an estimate. He not only estimated the value of his services, or rather the *extent* of his services, but he estimated the time in which he would be required to perform those services and the probable expense. Now the interpretation for which the appellants contend would make the length of time in which the plaintiff would be engaged in the work a mere estimate, but the compensation would not be an estimate but a definite fixed sum, when exactly the same terms were used by the plaintiff in speaking of the time

Mecartney v. Trust Co.

required and the value of the service to be rendered. He had stated what he thought his time would be worth and what he thought the time of his assistants would be worth, and the estimate of the time required is spoken of in direct connection with the compensation expected. Apparently it was not in the minds of either party to fix a fee at a definite lump sum. The estimated time for obtaining a decree ran from four to eight months, the final realization on the claim from two to two and one-half years, and the estimated value of the services to be rendered *during that time* ran from ten thousand up to twenty-five thousand dollars.

It actually turned out that a final decree was not reached until more than six years, and the estimate of two or two and one-half years for the realization of the company's demand stretched into nine years.

He likewise estimated that a $5000 retainer would be sufficient to defray all expenses, including "retainers to local counsel," which amount would "last until a decree were reached in the Kansas City case." As it turned out he had paid out about thrice that sum and incurred obligations to pay nearly as much more before that end was reached.

Appellants in contending for their construction overlooked another feature of plaintiff's letters. In giving his estimate *only two cases are mentioned,* the Channel & Dock cases and the Suburban Belt case. It turned out that a number of other cases afterwards were loaded upon plaintiff that could not have been in contemplation at that time.

The construction contended for would strictly hold the plaintiff to his twenty-five-thousand-dollar limit in fees, but would not limit defendant to the cases actually specified in which the service was to be rendered. Appellant would construe it strictly against the plaintiff, and liberally in favor of itself. It would make his compensation limited and his work unlimited. It would keep his pay within the strict letter of the contract and impose upon him labor and responsibility not mentioned

274 Sup.—16.

or dreamt of when the contract was entered into. There must be some sort of consistency in interpretation of the contract so as to make it bear equally upon both sides.

Besides all the additional cases there was unanticipated labor in the Suburban Belt case. The plaintiff, it is true, had made an investigation of the situation and estimated the fees which he would earn on the apparent volume of the work before him, as he could ascertain that volume from the records which he had investigated and other information obtainable. As it actually happened, new issues were brought into that case and new contingencies developed which prolonged and intensified his labor and multiplied his responsibility to such proportions that no amount of previous investigation could have revealed the extent of the task which he undertook.

Still another feature of the matter is important. When the contract of employment was entered into it was an implied obligation of the Trust Company to exercise good faith toward the plaintiff and render him such aid and counsel as the circumstances might require. As a matter of fact the management turned against the interest of the stockholders and so hampered plaintiff that his work and responsibility were redoubled. This will be noticed further in considering the value of his services.

It is suggested that either the fee was fixed or there was no contract at all. That position is untenable, because contracts of hire often are made and binding upon the parties when no definite compensation is fixed in terms at all. In such case the compensation is *quantum meruit.* In this case where it was understood that plaintiff was to receive a reasonable compensation for his services, he certainly was in no worse plight than he would have been if he had been employed without mention of compensation and a promise to pay implied.

So we hold that upon a proper interpretation of the contract plaintiff was to receive a reasonable compensa-

tion for his 'services and the services of those whom he might associate with him and to whom he would be responsible; that both the amount of work and time required, and therefore the amount to be paid, were merely estimated on the face of the cases mentioned as they then *appeared,* and there was no limit except the actual value of the services to be rendered.

II. Appellants assert that plaintiff sued on contract and was allowed to recover on *quantum meruit.* This is incorrect. The petition states in detail and at great length the services rendered by him **Variance.** and asks judgment for the value of those services. There is not in the petition, as appellants argue, an allegation of ''a promise to pay a specific amount for services.'' The case proceeds upon a theory that plaintiff was employed without any definite amount fixed as compensation for his services. He might very properly, as he does, state the contract under which he was employed and give in detail all the circumstances relating to his employment and still have his action in *quantum meruit.* [Redman v. Adams, 165 Mo. 1. c. 70; Cann v. Rector, Wardens, etc., 111 Mo. App. 1. c. 183; McCormick v. Fidelity & Guar. Co., 114 Mo. App. 1. c. 465-6.]

In cases where the stipulation in a contract for compensation for services cannot be enforced (Cozad v. Elam, 115 Mo. App. 136), or where service is rendered under contract without a definite and distinct understanding as to the amount of compensation, recovery may he had *quantum meruit.* This is called assumpsit on *quantum meruit.* [Bouvier.]

An agreement such as existed here, where plaintiff was to receive a reasonable compensation for the services rendered, to be ascertained after they were rendered, is not like those contracts where there is a definite rule or method of ascertaining the compensation to be paid and where it is left to a future ascertainment by measuring in some manner the work performed. There was no understanding that plaintiff's compensation was

to be definitely measured by the day, nor by the case, nor by any other yardstick.

He was to receive what his services were worth, was the understanding of the parties as appears in the pleadings and the arguments of both sides. The only difference between the plaintiff and the defendant in that respect is that according to the defendant the compensation for the services to be rendered was not to exceed twenty-five thousand dollars; according to the plaintiff there was no such limit. On the defendant's theory the ascertainment of the services rendered and their value was necessary in order to determine whether the amount ascertained would fall below the limit or reach it. Accordingly the defendant filed its motion seeking to make the plaintiff's petition more definite and certain and requiring plaintiff to file with it "an itemized account of his various services and the value thereof and the dates and amounts of the same." This motion was sustained, and subsequently defendant presented two motions to strike out the amended petitions, filed in response to it, for the alleged reason that the plaintiff had not been sufficiently specific in complying with the court order and had not set out with sufficient particularity the actual services rendered and their value. This shows that the theory of defendant all the way through was that plaintiff was entitled to recover the value of services rendered with a maximum limit, while the plaintiff proceeded upon the same theory without a maximum limit.

The answer of the defendant is upon that theory. It characterizes the plaintiff's two letters constituting the contract as a "*representation*" that plaintiff's fees would not run beyond $25,000 and the defendant "relied upon said written representation as a part of the contract of employment." Then the answer further alleges that the plaintiff already had been paid more than his services were worth.

In the very necessities of the case, according to the theories and pleadings of both sides, the case was one on *quantum meruit*.

III.  The principal point argued is whether the demand of the plaintiff and the judgment granted him by the circuit court was reasonable.   The trial judge, in

Findings.        addition to his general finding for the plaintiff, set out a lengthy memorandum of specific findings of fact.   This document is not a finding under the statutes and adds nothing to the general finding in favor of the plaintiff.   It is of some value, however, as showing the manner in which the judge draws inferences from the evidence different from those drawn by the referee, and the specific reasons for certain conclusions reached by him.

Appellants ask this court to review the evidence in the case for the purpose of ascertaining whether the fees charged are reasonable and the judgment of the trial court is supported by the weight of the evidence. This was a compulsory reference, and this court has held that in a case where a compulsory reference is ordered and the right of trial by jury denied thereby, the case is converted into a case in equity such that this court is required to review the findings of the referee which have been affirmed by the trial court, citing Reed v. Young, 248 Mo. 606; Weber Implement Co. v. Acme Harvesting Machine Co., 268 Mo. 363. But if the case is one at law and the report of the referee in compulsory reference is set aside and the trial court makes a finding of its own, a different rule obtains.   [St. Louis to use v. Parker Washington Co., 271 Mo. 229, l. c. 240; State ex rel. v. People's Ice Co., 246 Mo. 168, l. c. 202-211; Utley v. Hill, 155 Mo. l. c. 258; Williams v. Santa Fe Ry. Co., 153 Mo. l. c. 511.]

In the present case the court sustained exceptions to the referee's report, set the same side and permitted additional evidence to be introduced. This additional evidence was of considerable volume and tended to show

the favorable effect and therefore the value of plaintiff's work. The court then made a distinct finding of its own, and that finding, so far as the facts are concerned, is binding upon this court if supported by the evidence.

IV. We have examined the evidence in relation to the services rendered. We have already examined the status of litigation which the plaintiff undertook to conduct at the time he entered defendant's employment and have mentioned the additional work and responsibility which he was required to shoulder as the matter progressed.

Reasonable Compensation.

At the time he was employed there were two cases pending in which the defendant here was interested, as heretofore noted, designated as the Suburban Belt case and the Channel & Dock case. The Suburban Belt case was the case in which the Cambria Company, the Provident Company, and receivers of the Belt Company, had each filed a bill, and the Trust Company was enjoined from proceeding to enforce its claim against the collaterals which the Belt Company had given to secure its indebtedness to the Trust Company, and an accounting was sought. The Trust Company's claim at that time amounted to about $400,000. The plaintiff believed that the Southern Company was liable for this indebtedness and had become so liable at the time of its absorption of the Belt and other companies. It was plainly in contemplation, though not mentioned in letters nor in the order employing the plaintiff, that this claim should be prosecuted against the Southern Company, either in the State court, or in the Federal court in the Suburban Belt case then pending, so it may be said that an additional suit was thus contemplated and within the proper understanding of the duties which plaintiff undertook at the time he made his estimate. Afterwards suit was brought in the State court, but the claim finally was enforced and collected in the Federal court in the Suburban Belt case.

This Suburban Belt case had been pending four years. Eight thousand pages of testimony had been taken in the hearing before the special master who had been appointed to hear it. Plaintiff thought the bills of the petitioners were bad, as they in fact proved to be, and that the case would go speedily out of court on that account. His expectation was to move speedily, which he did, to end the taking of testimony and bring the matter to issue. From the appearance of things, as the matter then stood, he had a reason for his belief that a final decree could be obtained in four, five or eight months, and that the claim of the Trust Company could be realized on in two or two and a half years. He understood, as a lawyer of experience, that delays might occur, that unexpected contingencies might put the matter back, and expediencies be resorted to for delay on the part of the defendants. The inertia of the master and the court were to be counted on as opposing a speedy determination. Yet, with all that it cannot be said that his expectation as to the duration of the litigation was unreasonable.

A few months after his employment judgment was obtained against the Trust Company as surety for the Belt Company in the amount of over thirty thousand dollars, which the Trust Company was obliged to pay. He immediately brought suit against the Southern Company for reimbursement of the amount. This was not in contemplation and could not have been in the minds of the parties at the time he was employed because the liability had not accrued. This, with the suit for $400,-000 against the Southern Company and a suit on account for $30,000 against the same, were called the "State Court cases."

In July, 1905, the Southern Company filed a bill in the Federal court to enjoin the Trust Company from prosecuting the State Court cases. The Southern Company was sustained in this in the Federal district court, and the plaintiff appealed to the United States Circuit Court of Appeals, where he secured a reversal of the

judgment. The case, Guardian Trust Co. v. Kansas City Southern Railway Company, is reported in 146 Fed. 337.

In November, 1907, after plaintiff got rid of all dilatory expedients and was in position to force the State Court cases to trial, the Southern Company filed another proceeding in the Federal court to enjoin the prosecution of those cases. This also was decided against the defendant, was appealed by the plaintiff to the Circuit Court of Appeals, where he again secured a reversal of the judgment of the district court, and the case, Guardian Trust Co. v. Kansas City S. Ry. Co., is reported in 171 Fed. 43.

Neither of these cases could have been reasonably anticipated by the plaintiff at the time he was employed because the proceedings enjoined had not even been brought, and when he did file them he had reason to expect that they would move regularly to a conclusion without having to defend against these side attacks.

At the time of the plaintiff's employment the Southern Company was not a party to the Suburban Belt case, but in March, 1905, was made a party on stipulation, and filed an intervening petition in which it claimed the property held by the Trust Company as collateral security, which put it at antagonism with the Trust Company in that case, as the other petitioners were. In addition to the relief asked in that regard it asserted a direct claim and prayed judgment against the Trust Company for about a million and a half dollars for an alleged breach of trust whereby the Trust Company, it alleged, had diverted from their proper purpose the proceeds of the bonds, of which it had charge as trustee. This was a new element engrafted upon the litigation which was no. apparent at the time plaintiff investigated affairs and made his estimate as to the value of his services.

The plaintiff had expected to bring a speedy termination to the Suburban Belt case on account of the defective bill, but when he moved to have the proofs closed on account of the infirmities in the bill he was confronted with a stipulation which had been signed by his predeces-

sors, and which required a continuation of the accounting instead of any short cut to a conclusion of the case on account of bad pleading. Notwithstanding his utmost efforts to expedite the accounting, it dragged along until more than 34,000 pages of record were written, comprising fifty-eight volumes. The fees of the stenographer who took the testimony were $25,000, and the fees of the special master who heard and reported the case were $25,000. The master's report was nearly 400 pages in length; there were over 200 separate and distinct hearings, some of which extended far into the night. This report was filed eight years after the case had been referred, notwithstanding the persistent efforts of plaintiff and his predecessors to hurry the proceedings.

The plaintiff was employed on December 6, 1904, was discharged March 27, 1908, a period of three and one-third years. Appellant's counsel argue this point by taking that period and dividing it by the number of years, months and days and estimating the amount of compensation which the plaintiff is demanding per day, per month, and per year. They entirely overlook associate counsel which plaintiff was obliged to employ at his own expense. As said by the trial judge in commenting upon this feature:

"There is another feature of this case which is not to be overlooked, and that is the heavy liability incurred by plaintiff for the fees of his assisting lawyers. These men were no mere tyros in the profession, they were and necessarily had to be men of high attainments and skill. Their services could not be had for small and unremunerative fee."

Among those employed was Mr. Rosenberger of Kansas City, who spent about as much time and labor upon the cases as the plaintiff; Mr. Histed of the firm of Harkless, Crysler & Histed of Kansas City, who assisted chiefly in the case in Texas; Mr. Brown of Chicago, not associated in business with the plaintiff, but employed by him. Mr. Brown visited Kansas City with him in the investigation of the case and did important work. Be-

sides plaintiff had associated with him in business in Chicago, Mr. Strong and Mr. Swain and Mr. Price, who assisted in briefing and otherwise preparing the cases. So there were three lawyers working on the cases besides plaintiff, and three in his office force, making seven all together. According to appellant all these lawyers did not earn more in all the cases than a stenographer was paid for reporting one case.

The plaintiff himself testified that his practice was practically ruined during the time he was employed in this case, and it had run from $25,000 to $30,000 per year (presumably for himself and several assistants whom he had in his office at Chicago); that during the three years in which he was conducting this litigation his practice shrank until it amounted to less for the three years than it had averaged before for one year. Mr. Rosenberger, plaintiff's principal assistant, testified that his practice went in the same way, and that his time practically all was consumed during the greater part of the period of employment. It was characterized as the most exacting, heart-breaking, man-killing labor, which these attorneys undertook and conducted.

At the time of his discharge plaintiff had received from the defendant the sum of $27,500. Of this amount he had paid something over $7000 for expenses, and had paid as much or more to other lawyers, and had incurred obligations for practically all the remainder to the several attorneys who had been assisting him. If the contention of defendant is to prevail, that plaintiff already has received more than his services were worth, he comes out of this litigation with little or nothing for himself and his associates and office force in Chicago. If the amount demanded by plaintiff is properly apportioned between him and Mr. Rosenberger, after paying reasonable fees to the others assisting in the cases, according to the evidence presented, he would receive less than he lost from his practice by reason of being employed in the case. The greater part of this work in this Suburban

Belt case, it must be remembered, was of a character not to be anticipated at the time plaintiff was employed.

Of course the defendants knew and understood that plaintiff maintained his office in Chicago where he would do his preparatory work and that he would have to make frequent trips. He actually made thirty-nine trips from Chicago to Kansas City. Many and voluminous briefs were printed and filed in the several cases appealed and many letters and telegrams exchanged. The record shows in the neighborhood of more than 1100 letters and telegrams between plaintiff and defendant and his several assistants during the progress of this litigation.

Another feature of the case must be noticed. Several years before the plaintiff was employed, one John W. Gates, who was in control of the Southern Company, became interested in the Trust Company. The interests of these two companies were antagonistic, but the principal interest of Gates was with the Southern Company, and throughout the litigation his efforts were to have the Southern Company prevail over the Trust Company.

It is unnecessary to follow the ramifications by which Gates worked out his plans, but he and his associates procured the selection of one John A. Prescott to serve on the Trust Company's executive committee. Appellant admits there was reason to believe that Gates tried to wreck it, and that Prescott was put on the Trust Company's executive committee to represent the Gates interest. Prescott's persistent infidelity to the Trust Company is not seriously denied. Gates appeared to control all the litigation against the Trust Company. The judgment of the Cambria Steel Company, mentioned above, was confessed, and on the *same day* its creditor's bill was filed, and also the foreclosure suit of the Provident Company. The Federal Court of Appeals afterwards found those two companies, as well as the receivers of the Belt Company, were the instruments of the Southern Company. It is charged by the plaintiff here, and the evidence sustains the charge, that Prescott, throughout the entire litigation, did everything in his power to harass and em-

barrass the Trust Company, in the prosecution of the cases, and to discredit this plaintiff. At one time Prescott attempted a compromise of the Trust Company's claim against the Southern Company, for about one-third of the actual amount due. This effort was blocked by the plaintiff, whereby he incurred the particular ill will of Prescott. Prescott was assisted in his schemes by one Edward C. Wright, an attorney, who was one of defendant's attorneys. It seems that Wright, without the knowledge of plaintiff, hampered him sometimes by filing embarrassing stipulations in the pending cases. Finally, by a systematic canvass of the scattered stockholders of the Trust Company, Prescott secured control of that company. Plaintiff afterwards discovered that Prescott, in his management, was allowing certain property of the Trust Company to be made over to the Southern Company without consideration, and sought to interfere, thereby further incurring Prescott's dislike and ill will. As characteristic of his difficulties, on one occasion upon being requested by Prescott and Wright to resort to some questionable method by which to defeat or delay the prosecution of the Trimble & Braley case, plaintiff declined and wrote to Prescott:

"Every retainer that I take is upon the implied condition that *I win only by fair methods.*"

From the evidence it is a fair conclusion that it was the fidelity of the plaintiff to his client, and the efficiency with which he preserved and protected its interests and conducted its litigation, not only against the most resourceful attorneys that the opponents could secure, but against the secret machinations and open opposition of the managers of his own company, that finally procured his discharge.

The result of his efforts may fairly be considered as an element in measuring the value of his services. The Texas case was settled so as to relieve the Trust Company of all liability for which it was sued, amounting to about a million and a half dollars, by relinquishing a counterclaim of $22,000 and paying the costs of that case,

$2,000. That was after two thousand pages of testimony had been taken. He prosecuted the Belt case to a final conclusion before the master whereby the case was argued for many days, and there was nothing to do at the time of his discharge from that case except for the master to file his report. He defeated the two injunction suits on appeal which had been brought in the Federal court, whereby all State Court cases had been tied up. The result of the Suburban Belt case was a defeat of the claim of the Southern Company for about a million and a half dollars, and the final establishment of the plaintiff's claims against the Southern Company, which were finally paid and amounted to more than eight hundred thousand dollars. Besides, the Federal court reserved to defendant the right to recover from the Southern Company also the fees paid plaintiff in that case, the fees sued for here.

After plaintiff's discharge the Federal court decided the Suburban Belt case against the Trust Company and it appealed to the Federal Court of Appeals. In this appeal it looked as if Prescott were getting in his work in favor of the Southern Company, for no error was assigned to the holding of the lower court to the effect that the Southern Company was not indebted to the Trust Company. It appears the appeal was merely perfunctory and without expected tangible results. Although plaintiff had been discharged he was employed by some of the stockholders, and on their petition he intervened in the Federal Court of Appeals and secured a determination of the question which the defendant's counsel had sought to eliminate from the case. Against the violent opposition not only of the Southern Company but of the *then counsel for the Trust Company,* his former client, he succeeded in projecting the proper issue into the case and in securing a favorable decision for this defendant.

It is asserted by the appellant here that he seeks compensation for the services rendered on that appeal. And it is claimed that it was error to introduce the proceedings and record of that case, which was heard twice in the Federal Court of Appeals, Central Improvement

Co. v. Cambria Steel Co., Guardian Trust Co. v. Cambria Steel Co., 201 Fed. 811, 210 Fed. 696.

In those decisions it was held that the Cambria suit, the Provident bill, the Southern intervention, and all the proceedings by which the defendant had been held up for years, were largely collusive and baseless. The plaintiff does not claim any compensation from defendant by reason of services rendered in that appeal, but the proceedings and record in that case are introduced for the purpose of showing the soundness of plaintiff's theories in the conduct of the litigation with which he was entrusted, because defendant's answer had alleged that he was incompetent; and for the further purpose of showing the enmity and opposition of the managers of the defendant company, and how they sought to prevent a favorable result to the defendant. We think that the evidence was competent for those purposes.

The evidence is not only sufficient to support the finding of the trial judge as to the reasonableness of the plaintiff's claim, but an independent examination of this evidence is convincing that the plaintiff and his associates amply earned all that he sued for in the first count.

It may not be out of place to say that when the defendant answered in this case it alleged that the plaintiff's services were valueless because of blundering and incompetence, but on the final argument of the case and in the reply brief of appellant it is admitted that plaintiff properly conducted the litigation and deserves credit for carrying it through to a successful issue. Defendant further charged plaintiff with impropriety in criticising the Federal court, and this charge is founded upon *confidential letters* written by plaintiff to his client, the defendant.

V. It is suggested that plaintiff "in the first count of the petition sued for compensation for services rendered in the Belt and Channel & Dock litigation, and nothing more," and that, "he is not entitled to anything on account of extra work" because "he has not sued for it."

It seems to be conceded in this suggestion that a number of cases which were not in contemplation at the time of plaintiff's employment were undertaken. What has been said in Paragraph I and II settles that point. But it is proper to mention that the first count, after mentioning the employment in the Belt case, distinctly alleges the undertaking of additional work, for it says: "there were several other court cases and controversies which grew out of the same, or which cases and controversies in their issues of law or fact grew out of some of the issues involved therein or closely related thereto, in which cases and controversies plaintiff rendered various legal services." It then refers to the original employment for authority to handle those extras.

The effect of this allegation was not to limit plaintiff's recovery to the actual services in contemplation at the time the contract was entered, because here is an allegation that in pursuance of the original employment he performed a lot of *extra work* for which he is entitled to extra compensation. The case of Bond v. Sandford, supra, is directly in point, where an attorney, employed in a case for a specific fee, was allowed to recover for extra work done in the same case, though no further or additional contract was entered into regarding such extra work. The same is true of the other cases cited in paragraph I.

Further, the plaintiff sets out in his petition with great particularity all the work done. The defendant concedes that he is entitled to reasonable compensation for all services rendered in every particular, limited to $25,000, without regard to whether it comes within or without the contemplation of the parties at the original employment, and the case was tried out upon the theory that it was a *quantum meruit* action. The defendant nowhere suggests that the evidence offered is at variance with the pleading and raises no question anywhere that the pleading is not proper and sufficient to entitle him to compensation for *all* the work done. The answer of the defendant in response to the allegations of the petition as

to the specific services rendered alleges that "it has paid plaintiff the amount stated in the said first count, and that said payments were greatly in excess of the reasonable value of the services rendered by him to it." By this allegation the defendant placed itself squarely upon the proposition that all the services rendered by plaintiff are properly within the scope of the pleading and that he had been overpaid for all such services. The parties will be held in this court upon the same theory upon which they tried the case below.

VI. Appellant claims that the plaintiff is not entitled to interest, which was allowed by the trial court from the time the suit was brought. That interest may be allowed, and should be allowed, on claims of this character was decided by this ciurt in Trimble v. K. C., P. & G. Ry. Co., 180 Mo. 574. Appellants, however, contend that plaintiff sued for more in his amended petition than in his original petition; that he should not be allowed for interest on that extra amount between the dates of the filing of those petitions. In this, however, appellant is incorrect. In the original petition as filed in the first count plaintiff sued for seventy-five thousand dollars for services rendered "in divers legal matters and litigated causes," without specifying any of the "matters;" in his second count the plaintiff sued for a hundred thousand dollars, including eight thousand dollars expended for expenses for services rendered in the Channel & Dock case and the Suburban Belt case. The three State Court cases, and the two injunction cases are not mentioned in that allegation and might as well be referred to the first count and so may the Trimble and Braley case. So the amount sued for in the first petition was more than the $105,500 sued for in the final petition.

Defendant advances another reason why plaintiff is not entitled to the interest—because the plaintiff was responsible for the long delay in the final determination of the case by forcing a reference in the circuit court. The plaintiff certainly had a right to proceed in that way,

if in his judgment he thought that was the best way to obtain proper relief, and a reference is one of the methods by which justice in the courts may be accomplished. Plaintiff is not to be punished for resorting to any or all of the offices for the administration of justice which the courts afford. The defendant from the start denied any liability whatever and so far as the evidence shows made no effort at any time to make any kind of settlement; charged plaintiff with unprofessional conduct in abusing the courts and in general complaints of people with whom he came in contact; charged him with incompetence and blundering, and caused all the delay it could by appealing the case. There is nothing in the circumstances of the delay which would entitle the defendant to escape liability for the ordinary damages which accrue to a claimant on a deferred payment. The interest was properly allowed.

VII. Appellant further claims that plaintiff was bound by his agreement when employed to submit his claim to arbitration before he had a right to sue. It calls attention to the language of a letter of December 6th where he says:

"I would suggest that it (the ultimate charge) be fixed mutually by chosen appraisers."

Plaintiff also mentions the matter twice in subsequent reports to his client.

There is nothing in the record to show that the defendant at any time made any definite response to this suggestion except the resolution of employment at the date of the first letter. If it be conceded that it was the understanding of the parties that the value of his services might be ascertained by an appraisal, it goes to show that the actual value of his services was the measure of the compensation he expected to receive, for he adds in the same letter: "I suggest this simply as evidence that I endeavor to be under, rather than over, the market." Defendant, however, claims this is a condition precedent to bringing suit. There are several reasons

why this position cannot be maintained. If there is anything in the contract or in the circumstances which would authorize the court to say the plaintiff's suit was premature, the defendant cannot avail itself of the condition unless it is pleaded, and it is not pleaded. The answer pleads the contract and the $25,000 limit, denies all liability, and nowhere suggests that the contract requires appraisal as a condition precedent to the right to sue.

Another reason why the defendant cannot avail itself of this as a condition precedent to suing is that the contract does not make it so. An agreement to arbitrate does not oust the court of jurisdiction nor create a condition precedent unless by express words or a necessary implication the contract indicates an intention to make it a condition precedent. [Smith v. Preferred Masonic Mut. Acc. Assn., 51 Fed. 520, l. c. 522; Hamilton v. Ins. Co., 137 U. S. 370; Read v. State Ins. Co., 64 Am. St. 180, 103 Iowa, 307; Chadwick v. Ins. Co., 143 Mich. 481, 106 N. W. 1122.]

Further, this suggestion about an appraisal is entirely wanting in definiteness. Expressly it is a mere suggestion and no method is suggested by which the appraisers are to be chosen and the stipulation is not enforcible for that reason. [Aetna Ins. Co. v. McLead, 57 Am. St. 320, 57 Kan. 95; Greiss v. State Invest. & Ins. Co., 33 Pac. 195, 98 Cal. 241; Williams v. Branning Mfg. Co., 47 L. R. A. (N. S.) l. c. 358-9, note.]

VIII. Trimble and Braley who had resigned from the defendant's employment before plaintiff was employed sued for $22,000 for services. The plaintiff was required to defend this suit. He endeavored to escape the responsibility and requested the defendant to employ someone else, but through their insistence he was induced to take charge of the case. At one time he effected an agreement with Trimble and Braley whereby a compromise could have been reached on the payment of nine thousand dollars. However, this arrangement was

blocked by Prescott. The plaintiff was required to file in the suit four counterclaims arising on various accounts, some of them damages for alleged negligence in conducting the defendant's business. In the first counterclaim the defendant asked judgment for one hundred thousand dollars; in the second for one hundred thousand dollars; in the third for two thousand dollars, and in the fourth for six thousand dollars. It is unnecessary to go into an explanation of the way these various claims arose. The case was referred; a large volume of testimony was taken before the referee who reported adversely to the defendant, finding that Trimble and Braley were entitled to recover sixteen thousand dollars, and finding against the defendant on all its counterclaims. Exceptions were filed to this report and argued in the circuit court where the report was approved. Plaintiff was obliged to expend a great deal of time and labor in this case, as well as employ other attorneys. The trial court went into a thorough examination of the services rendered in this matter and found that plaintiff had earned $5500, and rendered judgment for that amount less the credits, which would leave a balance of $3433.70, the amount awarded on the second count. We are not prepared to say that the finding of the trial court on that count is unsupported by the weight of evidence.

The judgment is affirmed. *Roy, C.,* dissents.

PER CURIAM:—The foregoing opinion of WHITE, C., is adopted as the opinion of the court. All of the judges concur.